ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. WAITS.

(Court of Civil Appeals of Texas. Texarkana. Jan. 30, 1914. Rehearing Denied Feb. 19, 1914.)

1. RAILROADS (§ 348\*)—CROSSING ACCIDENTS—ACTIONS—SUFFICIENCY OF EVIDENCE.

In an action for injuries sustained in a crossing accident, evidence *held* sufficient to support a jury finding that the use of the crossing was attended with such extraordinary hazards or peculiar dangers as required the company, in the exercise of ordinary care, to keep a watchman there.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138–1150; Dec. Dig. § 348.\*]

2. RAILROADS (§ 307\*)—HIGHWAY CROSSINGS—FLAGMAN.

That travelers on a highway, by using the greatest possible care at a railroad crossing, might effectually escape danger, unless the company's employés, operating trains, were guilty

of culpable negligence, was not conclusive that a watchman or flagman should not have been kept there, since travelers are only required to use ordinary care.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 972–977, 979, 980; Dec. Dig. § 307.\*]

3. RAILROADS (§ 307\*)—HIGHWAY CROSSINGS—FLAGMAN.

Whether it was the duty of a railroad company to keep a watchman or flagman at a crossing depended on whether the circumstances and conditions existing at and surrounding the crossing, and its use by the public, and the passing over the crossing of engines and cars rendered the crossing extraordinarily hazardous and peculiarly dangerous to the public using the crossing, and exercising ordinary care, whether the company knew of such circumstances, conditions, and danger, whether an ordinarily prudent person in the same or similar circumstances would have stationed a flagman at the crossing to warn travelers of the approach of engines or cars; and, if either of these questions should be answered in the negative, it was not its duty to maintain a flagman there, while, if all should be decided in the affirmative, such was its duty.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 972–977, 979, 980; Dec. Dig. § 307.\*]

4. RAILROADS (§ 351\*)—INSTRUCTIONS—CONFUSED OR MISLEADING INSTRUCTIONS.

In an action for injuries sustained in a crossing accident, the court charged that it was not the duty of the railroad company to keep a flagman at every crossing, that whether or not it was its duty to maintain a flagman at the crossing in question depended on whether the circumstances and conditions existing at or surrounding the crossing at and before the time of the accident, and the use of the crossing by the public, while exercising ordinary care for their safety, and the passing over the crossing of engines and cars, rendered it extraordinarily hazardous and peculiarly dangerous to the public using the crossing, and exercising ordinary care for their safety, whether the company knew of such circumstances, conditions, and danger at and before the time in question, and whether an ordinarily prudent person in the same or similar circumstances would have maintained a flagman there to warn persons using the crossing of the approach of engines or cars, that, if either of these questions should be answered in the negative, then it was not its duty to maintain a flagman there, and it would not be liable, but that, if all of such questions should be decided in the affirmative, then it was its duty to maintain a flagman there to give such warnings. *Held*, that the instruction was not unintelligible,· misleading, nor confusing.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1193–1211, 1213–1215; Dec. Dig. § 351.\*]

5. RAILROADS (§ 351\*)—CROSSING ACCIDENTS—INSTRUCTIONS.

The use of the words "at and before" in such instruction was not erroneous, since it was necessary to look at the conditions existing before the accident to determine whether the company should have anticipated such consequences as the probable result of its failure to place a watchman at that point, and could not have harmed the company, where there was no evidence that the conditions existing previous to the accident were materially different from what they were at the time of the accident, especially where the court further charged, at the company's request, that, to find for plaintiff, the jury must believe from a preponderance of the evidence that the crossing was so

peculiarly dangerous that an ordinarily prudent person could not use the street in safety in the absence of a flagman, that defendant knew, or in the exercise of ordinary care could have known, that the crossing was so peculiarly dangerous, that an ordinarily prudent person would have employed a watchman, and that, if the company had a watchman at the crossing, the injury would not have been sustained.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1193–1211, 1213–1215; Dec. Dig. § 351.*]

6. NEW TRIAL (§ 44*)—MISCONDUCT OF JURY —VIEWING SCENE OF ACCIDENT.

Where jurors who were kept together and in charge of an officer were not instructed not to visit the place of the crossing accident involved, and, in visiting such place in charge of such officer, did not intend to disobey any order of the court, or violate any rule of decorum, there was no occasion for setting aside their verdict merely as a rebuke to them, and for the purpose of enforcing discipline.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 80–85, 105; Dec. Dig. § 44.*]

7. APPEAL AND ERROR (§ 1069*)—HARMLESS ERROR—MISCONDUCT OF JURY.

Where, in an action for injuries sustained in a crossing accident, there was apparently no conflict in the evidence as to the physical conditions at the crossing, defendant was not prejudiced by the act of the officer in charge of the jury in permitting them to visit the crossing, especially where defendant's counsel, without knowledge of such visit, thereafter moved that the jury might be permitted to view the scene of the accident.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4136, 4138, 4139; Dec. Dig. § 1069.*]

8. APPEAL AND ERROR (§ 977*)—REVIEW— DISCRETIONARY MATTERS.

Under Rev. St. 1911, art. 2021, providing that, where the ground of a motion for new trial is misconduct of the jury or of the officer in charge thereof, or, because of a communication to the jury, or because they received other testimony, the court shall hear evidence thereof, and, if the misconduct, testimony, or communication be material, a new trial may, in the discretion of the court, be granted, the ruling on a motion for a new trial, because the jury visited the scene of the accident involved, would not be set aside, except for an abuse of discretion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3860–3865; Dec. Dig. § 977.*]

9. DAMAGES (§ 132*) — EXCESSIVENESS — PERSONAL INJURIES.

A verdict for $35,000 for the loss of both legs by a young woman under 20 who had just been married was not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 372–385, 396; Dec. Dig. § 132.*]

Appeal from District Court, Smith County; R. W. Simpson, Judge.

Action by Joseph C. Waits, by next friend, against the St. Louis Southwestern Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Affirmed.

Marsh & McIlvaine, of Tyler, and Daniel Upthegrove and E. B. Perkins, both of Dallas, for appellant. Johnson & Edwards, of Tyler, for appellee.

HODGES, J. Joseph C. Waits, a minor, by his next friend, Thomas J. Malone, recov-ered in the court below a judgment for $35,000 for personal injuries sustained by Mrs. Cynthia Waits, the wife of the minor plaintiff.

The facts show that Mrs. Waits was injured at a railway crossing in the city of Tyler on the morning of November 16, 1912, while she and others were attempting to cross the appellant's track. About 11 o'clock on that morning Waits and his wife were leaving the city and were riding in a wagon with John Malone and his wife. They were going to the home of Malone in the country. The team consisted of a horse and mule belonging to Malone, and he was doing the driving. Waits and Malone were sitting together on the seat in the front part of the wagon, and their wives were reclining on some bedding in the rear. There were two other individuals, Will Malone and Floyd Webb, in a wagon just ahead of that in which the appellee was riding. In leaving the town the parties traveled from the public square west on Ferguson street about 300 yards to its intersection with Border avenue, and then turned north on Border avenue, which crossed the appellant's tracks on a grade, and about 500 feet north from Ferguson street. Border avenue was a much traveled thoroughfare, and the crossing was one used generally by the public. As the parties approached the crossing the wagon occupied by Will Malone and Webb passed over without accident or alarm about 40 feet ahead of the wagon in which the appellee, his wife, and their companions were riding. When the latter wagon approached to pass over the crossing it did not stop; but testimony indicates that Malone and the two women endeavored to ascertain by looking and listening whether or not a train was approaching, and that they did not see any, or hear any sound of a whistle or bell. The men both testified that as they approached the track they looked in both directions, and, not observing any train approaching them, drove on; that just after they passed the corner of a building on their left, and immediately south of the railway track, they discovered a train of cars coming from the west. This consisted of an engine and five box cars backing toward the east, and approaching the crossing. The leading car at that time was very close to the crossing. The team, being in danger of being struck by this car, became uncontrollable, turned suddenly toward the east, and ran off along the tracks, pulling the wagon over the rails and ties. Both women were thrown from the wagon onto the track, where two of the cars passed over them. After the team turned east in its flight, the cars gained on the wagon for some distance, and when the train was finally stopped the leading end of the car stood 103 feet east from the center of the Border street crossing. The wheels of the cars entirely severed one leg of Mrs.

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Waits a few inches above the ankle, and so injured the other leg that it had to be amputated a few inches below the knee. The only ground of negligence charged in plaintiff's petition which was submitted by the court was the failure of the railway company to maintain a flagman at the crossing where the injury occurred for the purpose of notifying parties approaching the track of the approach of trains.

[1] The first assigned error complains of the refusal of the court to grant a new trial because of the insufficiency of the evidence to support a finding by the jury that the use of the crossing where the injury occurred was attended with such extraordinary hazards or peculiar dangers as required the railway company, in the exercise of ordinary care, to keep a watchman at that place.

The testimony shows that at the time of this accident the city of Tyler contained about 11,000 inhabitants, and was surrounded by a considerable rural population. The crossing where the injury occurred is about 1,600 feet from the courthouse, which occupies a place on the public square of the city. The crossing is approached in the manner detailed in the preliminary statement. From this crossing to the city limits on the west and on the east, it is about one-half mile, and about one mile to the limits on the north. The railway passenger and freight depots and the principal yards are located east of this crossing. The yards of the Lufkin branch, the railway bridge and building yards, and the railway general office buildings are on the west. The principal cemetery of the city also lies west of this point, and in going to and from that place this crossing is much used. Border avenue is one of the principal highways of the city, is not only much used by the residents, but is the principal thoroughfare by which a large number of country people residing in the north and west portions of the county enter the city. The testimony shows that the first building on the west side of Border avenue and south of the railway track was a large box factory extending back west about 80 feet and south 48 feet, that immediately south of this building was an alley, and that from this alley on south to Ferguson street the buildings were close together, and it was impossible for one approaching the railway crossing from the south to see a train coming from the west till after passing the northeast corner of the box factory. That corner was shown to be 17 feet from a spur track used by the box factory, and 30 feet from the south rail of the main line. South of the railway track, and on the east of Border avenue, there was a small store building situated on the railway right of way, about 7 feet distant from the south rail of the spur track, and about 15 feet from the south rail of the main line. The distance from this store across the street to the box factory is 52 feet. There are buildings every 50 feet on south from this store. North of the tracks, and on the west side of Border avenue, there is a church and a number of residences. On the east side of Border avenue north of the railway tracks the buildings are not so thick. The tracks of the railway company extending west from the crossing are in a cut, and curve to the south. A person traveling north on Border avenue, after passing the corner of the box factory, could see a train about 100 feet distant; if driving a team, the forefeet of the latter would then be about on the spur track, and within 7 feet of the main line, according to the testimony. A person approaching this crossing from the north could not see a train either on the east or the west till he passed the houses on either side of the street lying next to the right of way. In addition to the extra trains and switch engines used by the railway company, there were eight regular passenger trains and six freight trains that daily passed over this crossing. It is undisputed that the railway company did not maintain a flagman regularly at this point, and did not have any watchman on this occasion. The testimony indicates that the employés in charge of the train that caused the accident used such precautions on this occasion in approaching the crossing as exonerated them from the charge of negligence in any respect. In view of this evidence we do not think it can be said that the finding of the jury upon this issue was unsupported. If the testimony of Malone and Waits and Mrs. Waits be accepted as true, they made an effort to ascertain if a train was approaching. While they did not stop the vehicle in which they were riding, they all looked and listened before going upon the track.

Malone testified as follows: "While we were approaching the railroad crossing on Border street houses all along on the west side of the street prevented our seeing a train coming from the west until we got where we could see around the corner of the box factory, and by that time the horses had reached the first track at the crossing; and houses all along on the east side of the street prevented our seeing a train coming from the east until we passed the corner of a store right by the side of the tracks, and by that time the horses were on the main track. Will Malone and Floyd Webb were driving in a wagon 40 or 50 feet ahead of us. I saw them when they approached and passed over the crossing; there didn't anything happen. While I was driving toward the crossing I did not know that any train was coming. The horse and mule I was driving were a good pert-walking team. * * * I did not hear any whistle or bell while approaching the crossing. When I got to where I could look by the corner of the box factory I looked west for the train, but saw none, and then I turned to look toward the east, and when I got to where I could see good down that way I turned and looked west again and saw the

train right close to us; I could not say how close; and the horses just broke and ran right down the railroad."

On cross-examination he said: "I did not stop before I went on the crossing; but I was listening and watching. If I had stopped before I reached the corner of the box factory, I could not have seen anything. I could hear without stopping, if there had been any sounds to hear. * * * I looked just as soon as I could. My team was going in a walk; they were not trotting. When I saw the train my team was on the main track, or between it and the sidetrack. The horses saw the train about the time I saw it, and they bolted down the track."

[2] Both Waits and his wife testified substantially in the same manner as to the precautions taken in approaching the crossing. It was shown by the evidence that a flagman stationed at that point could easily ascertain the approach of a person when attempting to cross the tracks, and the approach of trains coming either from the east or west, in time to avoid a collision. If the witnesses in this case tell the truth, the instance before us is in itself an evidence of the danger which exists at such a crossing. Here we have a finding supported by evidence, that neither the employés in charge of the train nor the occupants of the vehicle were guilty of negligence, yet an accident has occurred that has resulted in serious damage. Such an accident could have been avoided by a watchman in the proper discharge of his duties. The street, being a public one and much traveled, is presumably used by people of all classes, ages, and conditions, and in all of the modes and ways of travel customary in this country. The limited space in which the approach of a train could be discovered made it exceedingly probable that an injury of this character might reasonably be expected, even if all parties conducted themselves with ordinary prudence. It is true that one using the greatest possible care at such places might effectually escape danger at all times, unless the employés operating the trains were guilty of culpable negligence; but that degree of care does not furnish the test. The traveler on such occasions is only required to use ordinary care, and that degree of care may not be sufficient, as is shown by the facts of this case. M., K. & T. Ry. Co. v. Magee, 92 Tex. 616, 50 S. W. 1013; Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485.

[3-5] The following is a portion of the court's main charge to the jury: "It was not the duty of the defendant to have or keep a watchman or flagman at every crossing of its tracks over a public street of a city or town to warn persons traveling in the street and using or about to use the crossing of the approach of trains to pass over the crossing at the same time; and whether or not it was the duty of the defendant to maintain a watchman or a flagman for this pur-

pose, at the public crossing of its tracks over North Border avenue in the city of Tyler, at the time in question, depends on a proper decision of these questions, to wit: Whether the circumstances and conditions, if any in evidence, existing at and surrounding the crossing in question at and before said time, and the use of the crossing by the public traveling in the street, while exercising ordinary care for their safety in crossing the railway at said crossing, and the passing over the crossing of engines and cars moving on the defendant's railway, rendered the said crossing extraordinarily hazardous and peculiarly dangerous to the public, who used the said crossing at the place in question, and who used ordinary care for their safety in so doing; and whether the defendant knew of such circumstances, conditions, and danger, if any there were, at and before the time in question; and whether an ordinarily prudent person, in the same or similar circumstances, would have stationed and maintained a watchman or flagman at said crossing to warn persons using or about to use the crossing of the approach of engines or cars on the railway about to pass over the crossing at the same time. If either of these questions should be answered in the negative, then it was not the defendant's duty to maintain a watchman or flagman at the said crossing, and the defendant would not be liable; but, if all of these said questions should be decided in the affirmative from the evidence, then it was the defendant's duty to maintain a watchman or flagman at the said crossing to give the aforesaid warnings." In a subsequent paragraph the court applied the rule announced in this charge to the facts of the case. Both of these paragraphs are objected to first, upon the ground that the court did not announce the correct rule of law applicable to such cases, second, that the charge is unintelligible, and for that reason misleading, and, third, that it requires the jury to take into consideration the conditions existing before the accident occurred. We do not think the charge is subject to the objections that it does not correctly state the law, or that it is unintelligible and misleading. While the rule announced might have been expressed in different language, and with less verbiage, it is neither misleading nor confusing. The use of the words "at" and "before" in connection with the reference to the hazards mentioned is not harmful to the appellant. Certainly the jury should have been told to consider the conditions existing "at" the time of the accident. For the court to require them to go further and also take into consideration conditions shown to have existed "before" that time did not place any heavier burden on the railway company. It was necessary to look at the conditions existing before the accident in order to determine whether or not the appellant should have anticipated such consequences as the probable result of a failure to place a watch-

man at that point. Unless there were some hazards previously existing, it could not be said that the conditions were such as to notify the railway company of the probability of the dangers that arose upon this occasion. Moreover, there is no evidence that the conditions existing previous to the happening of this accident were materially different from what they were on the day the accident occurred. The only legitimate inference to be drawn from the evidence is that the precise conditions existing at that time had existed for a considerable time prior thereto.

At the request of appellant's counsel, the court gave the following special charge: "You are charged that, plaintiff's attorneys having stated to the court that plaintiff would not rely upon any of the grounds of negligence alleged in his petition other than the failure of defendant to keep a watchman at the crossing, you will therefore in your deliberations consider none of the other grounds of negligence set out in the petition. And in this connection you are charged that, before you can find for plaintiff on this issue, you must believe from a preponderance of the evidence that the crossing at which plaintiff's wife was injured was so peculiarly dangerous that an ordinarily prudent person could not use the street in safety, in the absence of a flagman to signal the approach of the company's trains; that defendant knew, or in the exercise of ordinary care could have known, that the crossing was so peculiarly dangerous that such a person could not use the street in safety unless a flagman was employed to signal the approach of trains, and that an ordinarily prudent person would have employed a watchman at said crossing to signal the approach of its trains; and that, if defendant had had a watchman at the crossing at the time of the accident, plaintiff's wife would not have been injured." That charge seems to have presented fully and concisely the very question to be determined by the jury in this case.

The principles announced in the special charges complained of in the seventh and eighth assignments of error are sufficiently covered by the general charge of the court, and by the special charge referred to above. The defense of contributory negligence was plainly and fully submitted to the jury, and there was no occasion for giving the special charge requested upon that issue.

[6-8] It is also urged that the court should have granted a motion for a new trial on account of certain misconduct on the part of the jury, which occurred during the progress of the trial, but was not discovered till after the trial had ended. This misconduct was in visiting the scene of the accident, and there making personal observations of the surroundings. The bill of exceptions reserved to the action of the court in overruling the motion for a new trial contains the following statement of agreed facts: "(1) That the jury were kept together by the court, and not permitted to separate from the time it was impaneled until after it rendered a verdict; (2) that after defendant had concluded its testimony, and before plaintiff offered his testimony in rebuttal, counsel for defendant moved the court in open court that the jury be permitted to go in custody of an officer to the scene of the accident, so that they might view and inspect the surroundings for themselves, which request and motion was by the court denied and overruled; (3) that counsel for defendant at the time of making said motion did not know that the jury had previously to that time visited the scene of the accident, and did not learn that such was the case until after the jury had returned its verdict." The bill of exceptions also contains the testimony adduced before the court detailing the action of the jurors in visiting the crossing. The substance of this testimony shows that after the conclusion of the proceedings on one particular evening the subject of visiting the crossing where the accident occurred was mentioned by some of the jurors, and the deputy in charge told them that after they had eaten supper he would take them around that way and let them see the place. He cautioned them, however, that they must not discuss what they saw. After supper, and after it had grown dark, the jurors passed along that way. They knew when they reached the place, and casually observed the surroundings; but they took no measurements, and did not make any specific observations. Some of them were already familiar with the place by reason of having passed it frequently before; others had never seen it before that time. The subject of what they had seen was not afterwards discussed by the jurors in their deliberations. Some of them said they found the conditions about the same as was shown by the diagram used upon the trial and as testified to by one of the witnesses. If there was anything irregular in this action of the jurors in visiting the scene of the accident, and in viewing the conditions there existing, it is because it enabled them to receive additional evidence as to what those physical conditions were. While the jurors were kept together and in charge of an officer, it does not appear that they had been instructed not to visit this place, and it is apparent that they did not intend to disobey any order of the court, or violate any rule of decorum. It is evident that in doing this they did not think they were committing any act of impropriety. Hence there was no occasion for the trial court to set aside their finding merely as a rebuke to the jurors, and for the purpose of enforcing needful judicial discipline. But, assuming that the jurors were, by reason of their visit and inspection of the surroundings, put in possession of additional evidence as to the physical conditions there existing, there is no reason for saying that this operated to the prejudice of the appellant. So

far as the record in this appeal shows, there seems to have been no controversy as to what those physical conditions were. If there was any conflict in the evidence as to the width of the streets or crossing, or the relative location of the various buildings, no mention is made of that fact in the briefs. Those physical conditions were susceptible of accurate ascertainment and proof, and were facts about which there was no occasion for any conflict in the evidence. The manifest willingness of counsel for appellant for the jury to visit the crossing and make a critical examination of the conditions indicated that they did not apprehend any prejudice from such an inspection, and there is nothing now presented to show that they were mistaken in that assumption. Article 2021 of the Revised Civil Statutes of 1911 is as follows: "Where the ground of the motion (for a new trial) is misconduct of the jury or of the officer in charge of same, or because of any communication made to the jury, or because the jury received other testimony, the court shall hear evidence thereof; and it shall be competent to prove such facts by the jurors or others, by examination in open court; and, if the misconduct proven, or the testimony received, or the communication made, be material, a new trial may, in the discretion of the court, be granted." It will thus be seen that, even if the additional evidence furnished the jury in this inspection be considered material, the granting or refusing of a motion for a new trial upon that ground rests in the discretion of the trial court. It is only when it is made to appear that this discretion has been abused that this court should set aside his ruling. Under the facts as presented we do not think that was done, and the assignment will be overruled.

[9] It is also urged that the verdict of the jury is excessive. The verdict is a large one. But Mrs. Waits was very young—not yet out of her teens—and had just entered upon the career of a married woman, prepared to enjoy whatever blessings, and to assume whatever burdens and duties, that relation might bring. Aside from the physical sufferings which she must have endured as the result of her injuries, to be thus deprived of both limbs at that time of life is a calamity not easily measured in dollars and cents. The full possession and free use of the limbs with which Nature has endowed us is at all times a priceless boon; but to one so young and just entering upon life's most alluring stage they must be more valuable still. To say that we apply the rule of compensation in allowing recoveries in such cases really falls far short of stating the truth. There can be no adequate compensation for the loss of such members. Arbitrary allowances have heretofore been made in similar cases, and these furnish the only standards by which we may now be governed. Testing the

present verdict by others where similar injuries have been inflicted, we cannot say that it is excessive. Railway Co. v. Shelton, 30 Tex. Civ. App. 72, 69 S. W. 656; Railway Co. v. Matkin, 142 S. W. 609; Railway Co. v. Kelly, 34 Tex. Civ. App. 21, 80 S. W. 1073; Oil Co. v. Snell, 47 Tex. Civ. App. 413, 106 S. W. 171.

The judgment of the district court is affirmed.